Caruthers, J.,
delivered the opinion of the Court
Richard Hancock died in Cannon county, Tenn., the 15th of July, 1855, leaving a widow and three children, the complainant, Alaminta, and the defendants. This bill is filed for the settlement of the estate, and to set aside a division of the slaves and other property made by the intestate and the parties, a day or two before his death. The slaves are fifteen in number, and are all, together with others given to the children before the last division, the descendants of “ Celia.” The first question which arises in the case, is as to the title to her; whether Richard Hancock had an estate for the life of his wife only, with remainder to her children, or the entire estate. This question is only important now, (as the children have received the slaves, and had a division of them,) on a question of advancement. On the marriage of Alaminta to Owen, two of the oldest of Celia’s children were placed in their hands as a gift, as they say, and they have increased considerably, and in the last division they accounted for them at their then present value; upon the idea that they only got the life estate, and that they wrere subject to the remainder interest .of all the children, when, if they got the absolute estate by the gift, they would only be liable to account for their value at the date of the gift, as an advancement. This would make a very great difference *565 in tbe amount of their share of the fifteen slaves. The complainants allege that they were mistaken as to their rights, when they went into, the recent division, and accounted for the present value of the slaves advanced to them, and signed the writing in relation thereto. They charge, that the defendants misled them, by stating that they had submitted to lawyers the clause of the will under which the title originated, and had legal advice to the effect stated, upon it; that they are now informed that the true construction excludes any remainder in the children, but gives the absolute estate to their mother, to which the marital right of their father attached. This statement shows that the first step towards the adjustment of the rights of the parties, is to place a construction upon the sixth clause of the will of Jacob Adams, made in North Carolina, in the year 1807. It reads ; “ Sixthly, I give to my daughter, Mary Cooper, a negro girl named Celia, during her lifetime, and if she should die without any heirs born of her body, the said negro girl and her increase, to return to my estate, and be equally divided among the rest of my children.”
Here is a disposition of the slaves to his daughter for life, and no express disposition over, except in one event, that she should die without “heirs born of her body,” which, in that connection, clearly means children, and in that event, to go to his, the testator’s, other children. This contingency did not happen, for she. died in 1858, leaving three children — the complainant, Ala-minta, and defendants. It cannot then return to his estate, and the question is, where does it go, when the event upon which it was to go over under the will became impossible 1 The position.. of defendants is¡, that *566 an estate by implication, the remainder, was vested in the children of the tenant for life. If that be so, the controversy is ended, as the division now impeached, was made upon that construction. This construction is, to say the least cf it, plausible, and the question is one upon which sound legal minds might differ, as it seems they did in this case.
An estate by implication can only be sustained on the principle of carrying the testator’s intention into effect. That rule may be illustrated by examples like these: A devise over after the death of the wife, or the arrival at age of a child, without expressly giving them any estate, would confer by necessary implication, an estate for life, or during minority. In these, the estate is disposed of in a manner to indicate unerringly, that the use was to be in the persons named until the happening of a certain event; there was no contingency. But here there is no reference to the heirs or children, with a view to give them any distinct estate, but only to specify an uncertain event, by which the rights of others were to be governed. That is, if no children were born of the daughter, then the bounty should not go to strangers to his blood, but return to his other children; but if she should have children, then the reason of limiting the estate to her life, no longer existed, and by making no disposition of it in that event, he clearly intended that her estate should be absolute and unlimited, and the property subject to all the ordinary rules applicable to the personal estate of married women, with reference to the marital rights of husbands, and the laws of distribution. To avoid these consequences, and secure benefits to children by way of what is familiarly called the en *567 tailment of property, there must be something tangible and explicit, so that persons dealing with it may not be entrapped.
In the will of Armstead Moore, there was a clause very similar to this, which we construed at last term, (5 Sneed, 127,) as we now do this.
Perhaps the only difference is, that there the estate given was general, dependant upon the contingency of dying without heirs of the body, and here it was for “life” in terms. Can this make any difference in the construction ? We think not; and so are the authorities. 2 Bro. Ch. R., 448; 2 Powel on Dev., 602; 22 Law Lib., 321. This is contrary to some of the old cases, but is now well settled. So the life estate expressly given, was enlarged into a fee, upon the birth of a child.
So our opinion is, that the Chancellor was right in holding, that upon the marriage of Richard Hancock in 1809, with the widow, Mary Cooper, and the birth of children, he became absolute owner of the slave Celia and her increase, and could dispose of them by advancement or otherwise, as he chose. And it must follow, that a gift to the complainants after they married, unexplained, would be an advancement; and only to be accounted for by them, in the distribution of his estate after his death, at their value when advanced. Such was the decree of the Chancellor, with the necessary account, upon that basis. To reach these results, it was necessary to make void and set aside a division of the property made by the parties at the instance of the father, a day or two before his death; and a bond signed by them all at that time, in which the slaves *568 given to complainants bad been accounted for by them at their increased value.
This raises the next and most difficult question.
It seems that on the marriage of complainants, some twenty-five or thirty years before, Jenny, a child of Celia, with her child Minta, were placed in their hands by Richard Hancock, and were by them retained and claimed as their own, down to this division. That they had increased to seven; that four of them had been sold, and the other three still -retained. A short time before the death of the old man, a difficulty seems to have sprung up among the children, as to their rights in relation to the descendants of Celia — whether they were entitled in remainder, after the death of their mother in 1858, under the will of her father, before set forth and construed; in which event the complainants would be bound to return or account for those held or disposed of by them, at their value at the end of the life estate ; or if there was no remainder then, their title by gift was good as an advancement, and they would only be bound to account for the value at the time received, which is proved to have been only five or six hundred dollars.
Their father was very anxious to have the matter settled before he died, and that there should be no contention among his children after his death. Steps were taken to bring the parties together at his house, two or three days before his death, to settle the matter. It appears from the proof, that the old man was not exactly certain as to the nature of his title. He most generally acted and talked in relation to these slaves, as if they were his own, absolutely, both before and since the death *569 of his wife; and at other times, said they were his only for the life of his wife, and after that, belonged to the children. Her, conversations were to the same effect, and such seems to have been the case among the children. And it was certainly a question about which they might honestly differ, and upon which their opinions would be apt to, and did fluctuate.
Four or five of the neighbors were requested to attend on the day designated, and make an equal division of all the slaves descended from Celia, including those that complainants had sold, and still held. The referees refused to act, until the parties agreed on some principle on which it was to be done. The difficulty seemed to be in reference to the slaves of complainants; how they should be accounted for. If at the value of the two when received, they would be entitled to a share in the fifteen on hand; but if for their value at that time, they would be entitled to no more; but the fifteen would go to defendants. The dissatisfaction of complainants appeared to be on the ground, mainly, that as they had raised the slaves, the benefit of their increased number and value ought not to inure to the brothers. The consideration, on the other side, was, that they had enjoyed their labor and services for a long period, and had sold four of them, and had the advantage of the proceeds. The complainants, however, brought their slaves forward, and finally acquiesced in the arrangement by which they were to keep the slaves they had, and get another, named Clark; and the fifteen remaining on hand, were to be equally divided between the brothers. This was about equal, or at least there is no complaint of it on that ground. This agreement was reported to the *570 referees, and their services were dispensed with. The •old man, on being informed of what had been done, was rejoiced at it, and proceeded to close up all his business upon that basis. He divided out his cash notes equally, between his sons and complainants, being $3000 each, after setting apart $1,000 for the widow. These were delivered over to the parties, and complainants went home with their notes and slaves. He also deeded his remaining lands to his sons, and died the next day. The fifteen slaves were not removed on the day of the division, but remained upon the place. No writing was executed upon the division.
These facts cannot affect the question. The title was then in Hancock, the father, and he sanctioned and ratified the division, and by that relinquished his title to the parties, respectively, before his death; nor does his personal representative take exceptions, or claim any of the slaves as the property of the estate. It is not for the complainants to make objections on that ground, because they took and held possession of the share allotted to them, both as to slaves and notes. No right had descended to any of them at that time, as the owner still lived. But the possession may be regarded as passing on that day, as the parties, and the slaves were all present, and the fact that they were not removed before the death, can make no difference, so far as the complainants are concerned. If the administrator could possibly make this question, which we do not concede, yet, certainly, they cannot. For the same, and other reasons, the want of a written conveyance from the old man does not invalidate the agree *571 ment, and prevent tbe passage of the title to the parties, under the circumstances.
Something is said in argument about the invalidity of the consent or waiver of her rights by complainant, Alaminta, on account of her coverture. She had no rights to waive; none had vested in her by the death of her father at that time, in the fifteen slaves, nor had she any in the others claimed as an advancement; for to them the marital right of her husband had attached. And even after the death, the right she would have by descent, in personalty, would be under the husband’s control, subject only to the wife’s equitable claim to a settlement until possession had been obtained, or the right legally disposed of by him. But in this case, no rights existed in any of them to the fifteen slaves, and none could or did pass from one of them to the other, but only from the owner.. It does not change the nature of the transaction, that he called them, or others into consultation, and chose to conform his action to their agreement, among themselves.
There is no doubt but that complainants, as well as defendants, acted upon the idea, that by the will they were entitled to the remainder in the slaves, and that it was what they called entailed property. There can be no doubt either, but that such was honestly the opinion of all concerned, at that time. It is very likely also, that complainants would not have agreed to the arrangement they did, if they had not believed the law would compel them to do so. But there is just as little doubt that equity and equality has prevailed over their strict legal right, and this was ardently desired by their father. He certainly had the unquestionable power, by gift or *572 will, to have produced precisely the same result, and we cannot tell but that he would have done so, if the parties themselves had not agreed to it, on that day. By the arrangement, the complainants have only been deprived of a legal advantage they possessed, and might have retained, provided the old man had not taken the matter into his own hands, in ease they had refused, and carried out his desire for equality by the exercise of his undoubted power of disposition, by giving the fifteen slaves to his sons, to make them equal with his daughter in the whole of the slaves in question.
On the 12th of July, 1855, when the four neighbors met, as before stated, for the purpose of making the division of the slaves, a writing was drawn up by one of them, Joseph Clark, binding all parties to stand to their action in the matter, under a penalty of $8,000.
This article was signed by all the parties, and by it they agreed that they should value, and equally divide into three parts, all the slaves, that is, the fifteen on hand, and those then held, or which had been sold by the complainants. As before stated, these men did not perform the duty assigned them, but the parties agreed upon the division themselves, and reported to them on the second day, 18th of July, that they had been able to come to an agreement among themselves, and with that they were all satisfied, and the referees thereby relieved from the duties imposed upon them in the writing.
Under all these circumstances, should a. Court of Equity restore the complainants to their legal advantage, on the question of advancement, and interfere with the solemn agreement of the parties, by which equality and *573 justice were produced ? We think not. It was a family settlement, in which the father, the children, and their select neighbors joined in consultation, and deliberately agreed upon terms of adjustment. The complainants took the benefit of three thousand dollars and an additional slave under it, and should not now be heard to complain. It was a doubtful question of construction upon a will, and it was not improper to settle it by agreement and compromise, as a case of uncertainty, about which honest differences of opinion existed. There was no unfair advantage taken, or imposition practiced. If the complainants were mistaken as to their strict rights, it was a mistake of law on a question of very doubtful solution. If they acted upon their own judgment, or the reported opinion of others, without fraud or misrepresentation, as we think they did, they must abide by their contract and agreement. There is nothing in the case to move a court of conscience to relieve them. This view avoids the necessity of noticing many other questions made on argument, and sets aside the account, with the exceptions.
The decree will be reversed upon this ground, the adjustment' of their rights made on the 13th of July, 1855, will stand; and the account taken, and the estate finally settled on that basis.